UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANTE LAWRENCE HUDGINS,

     Petitioner,       Case Number: 14-12831
                 Honorable David M. Lawson

v.

STEVEN RIVARD,

     Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

   Dante Lawrence Hudgins, a prisoner in the custody of the Michigan Department of Corrections, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his convictions for first-degree felony murder and first-degree child abuse. The petitioner argues that the trial court violated his rights under the Confrontation Clause by admitting the preliminary examination testimony of the medical examiner without a due diligence determination and that counsel was ineffective by failing to object to the admission of that testimony. The respondent argues that a portion of the petitioner's Confrontation Clause claim is procedurally defaulted and that all of the claims lack merit. Because the state courts' decisions on these issues faithfully applied federal constitutional law, the Court will deny the petition.

I.

   The petitioner's convictions arise from the death of six-month old Dante Hudgins, Jr., on March 29, 2011. Dante (known as "D.J.") is the child of Elec Adams and the petitioner. Elec Adams testified that, after D.J. was born, she, D.J. and the petitioner lived together on Eureka Road in Detroit. Adams attended classes to earn her high school diploma three or four days a week from 8:00 a.m. to 2:00 p.m. The petitioner watched D.J. while Adams attended classes. When D.J. was

approximately five months old, Adams and D.J. moved out of the petitioner's house and into her mother's home, which was located a few houses down the street from the petitioner's home.

On March 28, 2011, Adams needed some relief from taking care of D.J., so she asked the petitioner to take the baby for one night to allow her to get some rest.  The petitioner agreed to do so and he took D.J. to his house at approximately 7:00 p.m.  Adams testified that, approximately one hour later, she walked to the petitioner's house to check on the baby because he had been sick the night before.  D.J. was sleeping and seemed to be fine.  She returned to the home to check on D.J. again at about midnight.  At that time, he appeared to have a stomach ache.  Adams retrieved Pediasure from her mother's home and told the petitioner to give it to D.J. when he woke up.

Adams saw D.J. again at 11:00 a.m. the next morning, March 29, 2011.  D.J. turned six months old on that date.  Adams played with D.J. and was not concerned with his well-being.  After a little while, she returned home.  She again went to the petitioner's home at approximately 1:00 p.m.  At that time, D.J. was upstairs napping.  Adams stayed in the living room, but could hear D.J. crying from upstairs.  She talked with the petitioner about going upstairs to hold D.J. so he would stop crying.  The petitioner encouraged her to let D.J. cry himself to sleep.  She agreed.

Eventually she left the house to go to the Secretary of State's office with her mother.  While there, she received a text message from the petitioner at 3:22 p.m. stating:  "OMG you need to get home.  OMG you need to get home.  You need to get home. Something's wrong with D.J.?"  She and her mother drove to her mother's home because her mother's boyfriend, Antonio Hall, had called and said the baby was there.  D.J. was taken to the hospital by ambulance shortly after Adams and her mother arrived home.  At the hospital, medical personnel informed Adams that they were unable to revive D.J.

Adams testified that before that date, she did not have concerns about leaving D.J. with the petitioner. He was a capable caregiver. When she arrived at her mother's home on the day of D.J.'s death, the petitioner seemed very calm and was not crying.

Antonio Hall testified that on March 29, 2011, he lived with Kinya Adams (Elec Adams' mother) a few houses down the street from the petitioner's home. That afternoon, he heard banging on the front door. When he opened the door, he saw the petitioner holding D.J. in his arms. The petitioner said the baby was not breathing. Hall took the baby into the home and called Kinya's cell phone. Adams answered the phone and Hall told her the baby was not breathing. He then called 911; the operator instructed him to perform CPR. D.J. was taken to the hospital. Later, Hall saw the petitioner at the hospital and testified that the petitioner stayed for only two minutes.

Kinya Adams testified that when she was at the Secretary of State's office she received a call from Hall telling her that D.J. had stopped breathing. After she was interviewed by police, Kinya went to the hospital to be with her daughter. She testified that the petitioner arrived at the hospital approximately forty-five minutes after she did. He did not appear upset; she observed him earlier laughing with his aunt and father after the ambulance had taken D.J. to the hospital.

Detroit police officer Ben Biddle, the officer in charge of investigating D.J.'s death, interviewed the petitioner in April 2011. During the interview, the petitioner admitted punching D.J. in the back a couple of times on the day of his death. When D.J. continued crying, the petitioner hit him four or five more times. After the last punch, D.J.'s eyes rolled up, his body froze, and the petitioner panicked. He admitted that the previous month he had hit D.J. in the chest with a closed fist in an attempt to toughen him up.

Dr. Carl Schmidt, the Chief Medical Examiner for Wayne County (an expert in forensic pathology, did not perform the autopsy of D.J., but testified that the cause of death was *commotio cordis* and the manner of death was homicide. The preliminary examination testimony of Dr. John S. Somerset, an assistant medical examiner for Wayne County, was read to the jury. Somerset testified that he performed an autopsy of D.J. on March 31, 2011. He identified the cause of death as *commotio cordis* and the manner of death as homicide.

The defense presented two witnesses: Wendell Hatten (the petitioner's father) and the petitioner. Hatten testified that the petitioner, D.J., and Adams lived with him for five months after D.J. was born. He never saw the petitioner hit or abuse D.J. Hatten never noticed any injuries to D.J. or saw any indication that D.J. had been hit by anyone.

The petitioner testified in his own defense. He denied ever hitting or spanking D.J. The petitioner testified that D.J. spent the night of March 28, 2011 at his home. D.J. became fussy at approximately 4:00 a.m. so the petitioner gave him some Pedialite. Eventually the petitioner and D.J. fell asleep. The petitioner and the baby awoke at approximately 9:00 a.m. Adams checked on them at approximately noon. After Adams left to go to the Secretary of State's office, D.J. refused to take a bottle, so the petitioner took him upstairs and placed him on a pallet where he had slept the previous night. D.J. became fussy so the petitioner patted him on the back. While the petitioner was patting D.J., he felt D.J.'s body shut down. The petitioner panicked and sent Adams a text message. He then put the baby's jacket on and ran to Kinya Adams' home. From there, D.J. ultimately was taken to the hospital by ambulance. The petitioner acknowledged talking to Officer Biddle and signing a statement that Officer Biddle had written out, but testified that he did not read the statement before signing it.

-4-

At the conclusion of the trial, the jury convicted the petitioner of first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b), and first-degree child abuse, Mich. Comp. Laws § 750.136b(2). On February 27, 2012, he was sentenced to life in prison for felony-murder and eight to twelve years' imprisonment for first-degree child abuse.

The petitioner filed a direct appeal, arguing in the Michigan Court of Appeals that: (i) his rights to confrontation and due process were violated when the trial court allowed the preliminary examination testimony of Dr. Somerset to be read into the record; (ii) defense counsel was ineffective by failing to move for a due diligence hearing to assess whether Dr. Somerset was unavailable; (iii) photographs of victim were admitted improperly into evidence; and (iv) the trial court improperly denied the petitioner's request for a second-degree murder jury instruction. The Michigan Court of Appeals affirmed his convictions. *People v. Hudgins*, No. 309652, 2013 WL 3835974 (Mich. Ct. App. July 25, 2013). The Michigan Supreme Court denied his application for leave to appeal. *People v. Hudgins*, 495 Mich. 915 (Mich. Dec. 23, 2013).

The petitioner, through counsel, then filed this federal habeas petition. He raises these claims:

I.    The medical examiner, Dr. Somerset, who performed the autopsy and testified at the preliminary examination did not appear at trial, and because Dr. Somerset changed his findings of the cause of death, the Defendant should have been able to confront and cross-examine Dr. Somerset before the Defendant's jury as to how and why he came to changing his finding of the cause of death. It was not sufficient for the preliminary examination testimony to be read into the record in lieu of Dr. Somerset's live testimony at trial without a due diligence hearing to determine and excuse his unavailability which actually denied the Defendant his [due] process rights and right to confront Dr. Somerset pursuant to the US Constitution.

II.   Defense counsel's failure to motion the court to require a due diligence hearing to determine if Dr. Somerset was "unavailable" to testify to his findings at trial, denied the Defendant his due process right to the effective

-5-

assistance of counsel and his right to a fair trial, pursuant to US Const, Am VI; Const 1963, art I, sec 20.

Pet. at 2-3. The respondent opposes the petition contending that a portion of the petitioner's first claim is procedurally defaulted and that both claims lack merit.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Hudgins filed his petition after the AEDPA's effective date, its standard of review applies. Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

-6-

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 841 (6th Cir. 2017); *Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014); *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

## A.

In his first claim, the petitioner alleges that his Sixth Amendment right to confront the witnesses against him was violated when the trial court allowed the prosecution to introduce Dr. John Scott Somerset's preliminary hearing testimony at trial. The petitioner contends that the trial court improperly failed to conduct a hearing to determine whether Dr. Somerset was truly unavailable and whether the prosecution exercised due diligence and made a good-faith effort to secure his presence.

On the fourth day of trial, a sidebar conference was held, following which the trial court advised the jury that Dr. Somerset's previous testimony would be read into the record, stating, in part:

> [T]here was testimony [from Dr. Schmidt] to the effect that it was Doctor Somerset who actually performed the actual autopsy in the case.
> . . .
> [F]or reasons we don't need to go into, Doctor Somerset is unavailable to testify here in person today.
>
> However, he did testify at this earlier proceeding, and we have a transcript of that, and both sides have agreed that what we will do is we will read for you Doctor Somerset's testimony in this case from that earlier proceeding.

Trial Tr. at 46-47 (Feb. 9, 2012), Pg. ID 688-89.

Neither defense counsel nor the prosecutor objected to or commented on the reading of Dr. Somerset's testimony or the finding that he was unavailable to testify. And, according to the trial court's statement to the jury, both sides agreed to proceed in that manner. The preliminary examination testimony of Dr. Somerset then was read to the jury.

Dr. Somerset testified that he performed an autopsy of D.J. on March 31, 2011. He found evidence of several rib fractures, one that occurred immediately preceding death or up to three days before death, several that occurred between three and six weeks before death, and several that occurred more than four weeks before death. In the initial autopsy report, Dr. Somerset listed the manner of death as "pending." After reviewing police reports and the petitioner's statement to Officer Biddle, Dr. Somerset listed the cause of death as *commotio cordis*, which he characterized as trauma to the heart causing the heart to stop pumping efficiently. He also concluded that the manner of death was homicide.

On cross-examination, Dr. Somerset acknowledged that most cases of *commotio cordis* are caused by a blow to the chest, rather than a blow to the back such as was reportedly sustained by D.J.  Dr. Somerset also acknowledged that he had seen *commotio cordis* only three times previously in his career, and in every instance except D.J.'s the impact causing this condition was caused by a blow to the patient's chest, not the patient's back.  D.J.'s case was his first experience with a diagnosis of *commotio cordis* in a child.  Dr. Somerset acknowledged that D.J.'s injuries did not lead him to identify the cause of death at first as *commotio cordis*.  Initially, he considered D.J.'s unsafe sleeping position (he was lying face-down in blankets) as a possible cause of death.  He only identified the cause of death as *commotio cordis* after reading the witness statements.  Dr. Somerset also admitted on cross-examination that the cardiopulmonary resuscitation performed on D.J. could have caused the recent rib fractures.

Chief Wayne County medical examiner Dr. Carl Schmidt testified that, although he did not personally perform the autopsy, he discussed the case with Dr. Somerset because Dr. Schmidt reviews all infant death cases.  Dr. Schmidt testified about the contents of the autopsy report, noting that the report showed that D.J. had bruises on his back, nine rib fractures, a fractured vertebrae, a fractured palm, and a fractured thigh bone.  There were two sets of rib fractures: one set occurred within a couple of days of death, the other set occurred approximately six to eight weeks prior to D.J.'s death.  Dr. Schmidt concluded that all of this evidence clearly showed a pattern of chronic abuse.  Initially, Dr. Schmidt and Dr. Somerset did not identify a cause of death.  After reviewing police reports and the circumstances surrounding D.J.'s death, he and Dr. Somerset concluded that the cause of death was *commotio cordis*, or cardiac contusion, and the manner of death was homicide.

The petitioner raised this Confrontation Clause claim on direct review. The Michigan Court of Appeals held that the petitioner waived this claim because "the record shows that Hudgins' lawyer had a sidebar conference with the prosecutor and judge just before the admission of this testimony and that he did not object to the admission of the testimony; it, therefore, appears that he stipulated to the admission of the testimony, which would waive any claim of error." *Hudgins*, 2013 WL 3835974 at *1. The court held that even if counsel did not waive any claim of error, the claim was reviewed under the plain error standard because counsel failed to object. *Ibid.* The court found no plain error. *Ibid.*

The warden insists that counsel's failure to make a contemporaneous objection at trial amounts to a procedural default, barring habeas review. Although that may be so, the Court finds it unnecessary to address this procedural question. It is not a jurisdictional bar to review of the merits, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The procedural defense will not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

The Sixth Circuit has observed that "precedent is 'uncertain[]' as to whether plain-error review qualifies as an adjudication on the merits subject to AEDPA deference." *Brown v. Curtin*, 661 F. App'x 398, 405 (6th Cir. 2016) (quoting *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015); s*ee also Bickham v. Winn*, 2017 WL 1661419, *2 (6th Cir. Apr. 3, 2017) (observing that the correct standard of review is "uncertain" when a state court applied plain error review in deciding a claim).

The Court need not decide that question, however, because the petitioner cannot prevail even under the less deferential *de novo* review standard.

The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This right is "a fundamental right and is made obligatory on the States by the Fourteenth Amendment."  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The Confrontation Clause bars out-of-court statements that are testimonial in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  Under federal law, "a witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."  *Barber v. Page*, 390 U.S. 719, 724-25 (1968).  "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness"; "the prosecution bears the burden of establishing this predicate."  *Ohio v. Roberts*, 448 U.S. 56, 74-75 (1980), *abrogated on other grounds by Crawford*, 541 U.S. 36.

The state court record is silent as to why Dr. Somerset did not appear for trial.  The trial judge explained that the doctor was "unavailable" "for reasons that we don't need to go into," and told the jury — accurately, the Court presumes — that "both sides have agreed" that they would proceed by reading the preliminary examination testimony into the record.  Trial Tr. at 46 (Feb. 9, 2012), Pg. ID 688.  A reasonable reading of this record supports the conclusion that defense counsel was satisfied with the reason for Dr. Somerset's absence.  But since no record was made of that inquiry and no factual determinations were placed on the record, the Court is unable to consider the adequacy of the prosecution's efforts to secure Dr. Somerset's presence for trial.

-11-

Assuming, without deciding, that the Confrontation Clause was violated, the question remains whether the error was harmless. *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986) (holding that Confrontation Clause violations are subject to the harmless error analysis). Indeed, that is the more prudent approach to the issue in this case. *See Aleman v. Sternes*, 320 F.3d 687, 691 (7th Cir. 2003) ("Unless its jurisdiction is at stake, a court may take up issues in whatever sequence seems best, given the nature of the parties' arguments and the interest in avoiding unnecessary constitutional decisions."); *Fults v. Qualls*, 635 F. App'x 316, 321 (6th Cir. 2016) (finding that federal court, on habeas review, may proceed directly to a harmless error analysis).

A constitutional error is harmless if it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "To determine the effect of the error under *Brecht*, [the court] consider[s] both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial." *Peterson v. Warren*, 311 F. App'x. 798, 805 (6th Cir. 2009) (citing *Brecht*, 507 U.S. at 639).

The relevant factors for applying this test to Confrontation Clause errors include "(1) the importance of the witness's testimony to the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted and (5) the overall strength of the prosecution's case." *Binienda v. Scutt*, No. 09-13233, 2012 WL 3109430, at *15 (E.D. Mich. July 31, 2012) (citing *Van Arsdall,* 475 U.S. at 684).

These factors support a finding that the admission of Dr. Somerset's preliminary examination testimony did not have a substantial and injurious impact on the jury's verdict. The importance of Dr. Somerset's preliminary examination testimony to the prosecution's case was substantial, in that he performed the autopsy and witnessed the child's injuries first-hand. But the parties agreed to allow his report into evidence, and the testimony tracked that report accurately. In addition, Dr. Schmidt echoed those findings in his testimony.

More importantly under the Confrontation Clause, defense counsel effectively cross-examined Dr. Somerset during the preliminary examination and adroitly explored potential weaknesses in his report: his delay in identifying cause of death, his extremely limited experience with *commotio cordis*, and his use of witness statements rather than the physical evidence to identify the cause of death. It is hard to imagine the cross-examination could have gone significantly better for the defense, had it been replicated at trial. Indeed, testimony given at trial, after Dr. Somerset was made aware of potential weaknesses in his report, may have given Dr. Somerset the opportunity to provide more thorough answers supporting his conclusions.

Defense counsel also explored with Dr. Somerset the possibility of non-assaultive causes of D.J.'s injuries. Dr. Somerset's acknowledged that he initially considered the baby's sleeping position as a possible cause of death, believed CPR could cause broken ribs, and had little experience with a finding of *commotio cordis*. The petitioner has not made a plausible argument that Dr. Somerset's presence at trial would have enhanced the defense presentation, or that his absence had "a substantial and injurious effect or influence in determining the jury's verdict."

The Confrontation Clause error, if there was one, does not warrant habeas relief.

-13-

B.

The petitioner also criticizes defense counsel's decision not to resist the admission of Dr. Somerset's preliminary examination testimony. The Michigan Court of Appeals held that counsel's decision did not fall below an objective standard of reasonableness under prevailing professional norms. *Hudgins*, 2013 WL 3835974 at *2. The court reasoned that the petitioner's attorney "might reasonably have determined that Somerset's testimony was somewhat favorable." *Ibid.* In addition, "his lawyer might also have determined that Somerset's adverse testimony might be more persuasive if given in person and that the prosecutor might be able to elicit further testimony from Somerset that directly undermined" the defense theory of the case. *Ibid.* Finally, the state court observed that counsel may have "reasonably concluded that permitting the admission of Somerset's preliminary examination testimony was preferable to the risk associated with allowing Somerset to testify in person." *Ibid.*

A violation of the Sixth Amendment right to effective assistance of counsel is established when an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing

professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare, because the standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 572 U.S. ---, ---, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. ---, ---, 133 S. Ct. 1781, 1786 (2013)).  The standard is "all the more difficult" on habeas corpus review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and quotation marks omitted).  "[T]he question is not whether counsel' actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

The Court cannot quarrel with the Michigan Court of Appeals's reasoning on the deficient performance element of *Strickland*'s test.  That court offered cogent reasons why defense counsel's strategy of foregoing a trial-day challenge to admission of Dr. Somerset's preliminary examination testimony was not only reasonable, but also prudent.  The petitioner has offered countervailing strategic considerations.  But those reasons are insufficient to establish that the court of appeals's

decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Moreover, "[t]he prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review." *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009) (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). The Court held above that the admission of Dr. Somerset's preliminary examination testimony, even if in error, was harmless. Because the admission of that evidence was harmless error, the petitioner cannot satisfy *Strickland*'s prejudice prong. *See Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) (finding *Strickland* prejudice prong would not be met where the court found any error to be harmless). Habeas relief is denied on this claim.

### III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 20, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 20, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI

-16-